**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | | |
|---|---|---|
| **MICHAEL EASTMAN** | * | **CIVIL ACTION NO.** |
| **PLAINTIFF** | * | |
| | | 1:17 cv-00659-GPG |
| **VERSUS** | * | |
| | * | **SECTION " " MAG.** |
| **CORRECTIONAL HEALTHCARE** | * | |
| **COMPANIES, INC.** | * | |
| **CORRECT CARE SOLUTIONS, INC.** | * | |
| | * | |
| **MATHEW KILLOUGH, P.A.,** | | |
| in his Individual Capacity, | * | |
| **DAVID SMYTH, EMT.,** | | |
| in his Individual Capacity, | * | |
| **CHRISTINE STURGEON, N.P.,** | | |
| in her Individual Capacity, | * | |
| **MARIA ROSTAD,** | * | |
| in her Individual Capacity | * | |
| as Scheduler, | * | |
| **DEFENDANTS** | * | |

_____

**FIRST AMENDED COMPLAINT AND JURY DEMAND**
_____


COMES NOW, Plaintiff, Michael Eastman, by and through his attorney, Natacha

M. Gutierrez of Law Offices of Natacha M. Gutierrez, LLC, states as follows:

**JURISDICTION**

1. This is an action for damages and attorney's fees and costs, for the violation of Plaintiff's civil rights.  Jurisdiction is invoked under Title 42 U.S.C. §§ 1983 and 1988, and the Eighth Amendment to the Constitution of the United States.

2. This Court has supplemental jurisdiction to consider state causes of action under 28 U.S.C.A. §1367, the ancillary state claims which "form part of the same case or controversy" as other counts for which this Court has established jurisdiction.

## VENUE

3. Venue properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b).

## PARTIES

4. The Plaintiff, Michael Eastman, is a resident of Colorado and a citizen of the State of Colorado.

5. Mr. Eastman is an Army Veteran who was honorably discharged.

6. At all times material hereto, the Defendants were residents of Colorado and citizens of the State of Colorado.

7. The Defendant Correct Care Solutions (CCS) is a Tennessee Corporation in the business of owning and operating private prisons for profit in the United States, including private prisons in the State of Colorado.

8. At all times material, Defendant CCS owned and operated the medical unit of Jefferson County Colorado.

9. At all times material, Defendant Mathew Killough, P.A. was licensed by the State of Colorado as a physician's assistant.  At all times material hereto, Defendant

2

was an employee and/or agents of the Correct Care Solutions, acting under color of state law.

10. At all times material, Defendant Maria Rostad was a resident of the state of Colorado and an employee of Correct Care Solution.

11. At all times material, Defendant David Smyth was an emergency medical technician, upon information and belief works for Correct Care Solutions.

12. Upon information and belief, at all material times, she was tasked to supervise the medical staff at Jefferson County Correctional Facility.

13. The Defendant Correctional Healthcare Companies (CHC) is a Tennessee Corporation in the business of owning and operating private prisons for profit in the United States, including private prisons in the State of Colorado.

14. At all times material, Defendant CHC owned and operated the medical unit of for the Colorado Department of Correction.

15. At all times material, Defendant Christine Sturgeon, N.P. was licensed by the State of Colorado as a nurse practitioner.  At all times material hereto, Defendant was an employee and/or agents of CHC, acting under color of state law.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

**A. Denver Health Medical Care**

16. Mr. Michael Eastman entered Denver Jail in October of 2014.

17. On November 23, 2014, Mr. Eastman slipped and fell while in custody at Denver County Jail.

18. Mr. Eastman reported that he fell on his butt and broke his fall with his hand.

3

19. After the fall, he complained of back pain and denied that he had any numbness or tingling at that time.

20. On November 24, 20214, Mr. Eastman had a follow-up visit and complained that he twisted his back.

21. On December 9, 2014, Mr. Eastman filed a request for medical assistance asking to see an MD stating that the pain had not stopped.

22. He was seen by Dr. Christian Stob the next day and she ordered film on Mr. Eastman for the lumbar spine.

23. On December 11, 2014, x-rays were done and showed moderate severe disc spacing and thoracic spine spoldylosis.

24. Mr. Eastman filed another request for medical treatment on January 25, 2015 stating that he was feeling shocks in his upper body.  He also complained of spasms throughout his whole body.

25. Dr. Christian Stob reviewed the film and ordered an MRI.  The progress notes stated that there were no further nursing interventions available to at the Denver jail.

26. On January 27, 2015, Mr. Eastman continued to complain of muscle spasms and was found on the floor.  The spasms were found to be in all four limbs.

27. Mr. Eastman again requested medical treatment on January 31, 2015 complaining of shocking pains and numbness in his fingers.

28. On February 3, 2015, he again complained that he had another major attack and also had slurred speech and blurry vision.

29. Additional x-rays were ordered on February 5, 2015 for the cervical spine which showed severe discogenic changes at C4-C5 and C5-C6 and moderate changes at C3-C4 and C6-C7.  High-grade foraminal narrowing was suspected.

30. Mr. Eastman continued to complain about pain and body spasms.  On February 12, 2015, he complained that his pain was getting worse.

31. He also stated that the pain was making it difficult for him to void.

32. On March 9, 2015, additional x-rays were taken of Mr. Eastman's cervical spine.

33. On that date he was seen by Orthopedic Surgeons Dr. David Hak and Dr. Louann Berroa.

34. Dr. Berrora advised Mr. Eastman that he had significant degenerative changes throughout his cervical spine with kyphosis.  She recommended that Mr. Eastman get an MRI, a CT scan and a nerve conduction study.  Dr. Berrora specifically noted that she hoped that Jefferson County would follow her recommendations.

### B. Jefferson County Treatment

35. On March 16, 2015, Mr. Eastman was transferred to Jefferson County Correctional Facility.

36. Mr. Eastman was seen by Bryan Muscott, EMT for his intake at Jefferson County jail.  During that interview, Mr. Eastman advised Mr. Muscott that he had fallen while in Denver County jail and suffered injuries to his neck and back.

37. Mr. Eastman also advised that he was advised by the doctors at Denver Health that he should have an MRI and a CT scan.

38.   After intake, Mr. Eastman was put on an opiate withdrawal program.  No action was taken for his neck or back pain.  As Mr. Eastman was on opiate withdrawal protocol, he was closely monitored by the nursing staff.

39.   On March 17, 2015, Mr. Eastman was seen by Nurse Christine Vigil, RN.  At that visit, Nurse Vigil noted that Mr. Eastman was limited to bed rest.

40.   Throughout his confinement, Mr. Eastman continued to complain of pain.

41.   On March 17, 2015, Mr. Eastman complained to Nurse Monica Albers, RN, BSN of chronic pain.  Nurse Albers noted that she would task the provider.

42.   Mr. Eastman's case was then sent to Mathew Killough, PA-C to review the Denver Ortho notes that were in his box.

43.   PA Killough was the upper level provider responsible for Mr. Eastman's medical treatment.

44.   Despite the previous recommendations from the neurologists at Denver Health, Mr. Kilough failed to request a neurological consult for Mr. Eastman.

45.   Mr. Eastman completed a medical request form on March 22, 2015 advising that he was in a lot of pain and that he was supposed to have an MRI.

46.   A musculoskeletal evaluation was conducted on March 23, 2015 by Nurse Rebecca Strong.  Nurse Strong noted that Mr. Eastman was in constant pain and referred him to the provider.  She marked his care as routine.

47.   On March 29, 2015, Mr. Eastman again made a request for medical treatment. He complained of numbness, severe back and neck pain.  He again advised that he was supposed to have an MRI and asked to see the doctor.

48.    Instead of being seen by a doctor, Mr. Eastman was seen by Nurse Steven Nadeau on March 30, 2015 at 7:53 a.m.  During that visit, Mr. Eastman complained of numbness in both hands and both legs.  He was tender to touch and walked with his head bent.

49.    Nurse Nadeau marked his condition as urgent as Mr. Eastman had lost sensation, had numbness and severe pain.

50.    Later on March 30, 2015, Mr. Eastman was seen by Nurse Xiong for a health assessment.  During that assessment, Mr. Eastman continued to complain about neck and back pain.  At that visit he was referred to the PA again.

51.    Maria Rostad and CCS refused to approve the MRI and scheduled a CT scan instead.

52.    Ms. Rostad is not a medical professional and not qualified to make medical decisions regarding the necessity of medical treatment.

53.    On March 31, 2015, a CT scan was performed which showed severe chronic cervical spondylosis and suspected central spinal canal stenosis.

54.    After the CT scan, there was nothing in the records showing further treatment or a treatment plan for Mr. Eastman.

55.    Despite the results from the films taken, PA Kilough failed to create any treatment plan for Mr. Eastman and Mr. Eastman was provided with no treatment prior to his transfer to the Department of Corrections.

56. On April 14, 2015, an Inter-Institutional Transfer form was completed by EMT David Smyth, EMT. Mr. Smith had a duty to review Mr. Eastman's chart and complete the transfer papers according to his treatment needs.

57. Mr. Smyth failed to mention Mr. Eastman's diagnosis for his neck and back pain. There was also no indication that Mr. Eastman had had a CT or needed follow up treatment on the transfer form.

**C. Department of Corrections Care**

58. On April 17, 2015, Mr. Eastman was transferred to the Department of Corrections custody. Intake was conducted by Nurse Practitioner Teri Midgyett.

59. At intake, Mr. Eastman advised NP Midgyett that he had fallen while in custody at Denver County Jail. He advised that he had x-rays and a CT scan while in custody at Denver County and Jefferson County jails.

60. He continued to have complaints of numbness, neck and back pain. He also complained of tingling.

61. On April 21, 2015, Mr. Eastman's chart again noted that he had a history of neck pain.

62. On April, 28, 2015, the intake Nurse Practitioner spoke to an unnamed nurse from Jefferson County Jail who advised that Mr. Eastman had a CT scan and that the CT was done at Lutheran Medical Center. According to NP Midgyett, the nurse from Jefferson County told her that an MRI was not medically necessary. NP Midgyett also stated that she would get Mr. Eastman to sign a release to get the CT scan.

8

63. On May 29, 2015, Mr. Eastman had an appointment with Nurse Robert Mascarenas complaining of neck and left shoulder pain. At that visit, Mr. Eastman had limited range of motion and both hands were numb.

64. On June 9, 2015, Nurse Practitioner Christine Sturgeon reviewed Mr. Eastman's chart and ordered Neurontin and Naproxen.

65. Despite his pain and numbness, Mr. Eastman was still required to work. On June 12, 2015, Mr. Eastman fell on his left buttocks while attempting to get dressed before attempting to go to work. He was seen by Nurse Mascarenas and complained of pain radiating down his leg. Nurse Practitioner Frederick Paulsen was called and ordered stretches and ice.

66. On June 18, 2015, Mr. Eastman kited for medical assistance still complaining about back pain. He also advised that he had dropping things up to three times a week and had numbness in his hands. At this time Nurse Amy Hiltz requested an appointment with Nurse Practitioner Sturgeon.

67. Approximately two weeks later, NP Sturgeon attended to Mr. Eastman. On July 3, 2015, Mr. Eastman complained of numbness in his entire body. He also complained of spasms in his back and numbness in his arms. Mr. Eastman told NP Sturgeon that he was having difficulty caring his laundry and was losing upper body strength. He could not put his pants on because he was unbalanced. He also dropped things.

68. At this visit, NP Sturgeon reviewed Mr. Eastman's chart which contained the results of the CT done on March 31, 2015. At this time she requested an ortho consult. X-rays were scheduled.

69. X-rays were completed on July 8, 2015 showing degenerative disc space narrowing and associated endplate osteophytes. X-rays also showed facet athropathy and rudimentary discs were noted. Thoracic spine x-rays showed mild to moderate thoracic spondylosis.

70. On July 20, 2015 NP Sturgeon reviewed the chart and noted that the consult office requested an MRI.

71. On July 29, 2015, Nurse Hiltz followed up with Mr. Eastman who reported that he was falling twice a week and dropping his coffee cup several times a week.

72. On August 7, 2015, Nurse Practitioner Sturgeon examined Mr. Eastman. He reported dizziness and imbalance, loss of feeling in his arms, burning and numbing sensation down his arms. He also reported dropping things and feeling like he was going to fall. He requested a walker for safety.

73. NP Sturgeon noted that Mr. Eastman's gait was unstable and walked like he was intoxicated. She also noted that Mr. Eastman had a neurological consult and MRI scheduled for his neck, but may need further workup for MS.

74. On August 12, 2015, Nurse Mascarenas saw Mr. Eastman who was walking better. NP Strurgeon discharged the walker at that time.

10

75.   On August 29, 2015, Mr. Eastman filed a kite for medical shoes.  NP Sturgeon reviewed the request and denied it stating Mr. Eastman did not have any money on his books.

76.   Mr. Eastman finally got an MRI on September 11, 2015.  The MRI showed severe spinal canal stenosis with spinal cord compression and abnormal signal in the spinal cord.  It also showed severe degenerative disk disease with posterior subluxations.

77.   On September 23, 2015, Mr. Eastman had a Psychiatric intake appointment with Dr. Richard Heckman.  After his appointment, Dr. Heckman recommended walking minutes per day to increase his dopamine levels.  There was no mention by Dr. Heckman of Mr. Eastman's physical limitations.

78.   On September 29, 2015, Mr. Eastman filed a kite because he was being placed back on labor crew.  NP Sturgeon put him on restriction until there was an opportunity for an appointment with a neurologist.

79.   At her visit with Mr. Eastman on October 1, 2015, NP Sturgeon reviewed the MRI results and again stated that Mr. Eastman needed to go to the neurologist.  However, it still was not scheduled.  She wrote in the chart that she would email the scheduler to get an appointment.  At this time, Mr. Eastman was put in a neck collar.

80.   On October 14, 2015, Mr. Eastman complained to Nurse Hiltz that his pain was increasing.  She noted in the record that the neurological appointment was scheduled for November 3, 2015 but that he needed a sooner appointment.

81. On October 20, 2015, NP Sturgeon saw Mr. Eastman again. At that time he complained that he could not feel his fingers and was having difficulty with sensation. NP Sturgeon observed that Mr. Eastman had difficulty with sensation and that his grip was weak. She instructed him not to move his neck. She also noted that Mr. Eastman had a diagnosis of spinal compression.

82. On November 3, 2015, Mr. Eastman was finally seen by a neurologist at Denver Health by Dr. Herbert Fried. At that visit Dr. Fried opined that Mr. Eastman had severe myelopathy (spinal compression). Dr. Fried stated that Mr. Eastman would need surgery the sooner the better. The doctor asked that there be a follow-up in two weeks to discuss a surgical plan. Dr. Fried ordered a follow-up CT scan to look at the position of the bones in preparation for surgery. Those images were completed on November 20, 2015.

83. On November 11, 2015, NP Sturgeon saw Mr. Eastman after his visit to Denver Health. NP Sturgeon noted that she emailed the scheduler to advise that urgent surgery was necessary.

84. On December 1, 2015, Mr. Eastman saw neurologist Dr. Gene Bolles for a follow-up visit and to discuss surgery. Dr. Bolles noted that Mr. Eastman needed urgent surgery as he was progressing towards almost complete disability. Dr. Bolles noted that the risk of the surgery was high, but that Mr. Eastman had no other option.

85. On December 31, 2015, corrective surgery was performed on Michael Eastman. A second surgery was done on January 6, 2016.

86.   Despite improvement after surgery, Mr. Eastman has continued to have debilitating pain.   He is currently in physical therapy and remains physically disabled.

**D. Duty of CCS and Correctional Health Partners**

87.   At all times material, CCS and CHC had a non-delegable duty to provide prisoners with medical care and treatment pursuant to the Constitution of the United States, and the Constitution of the State of Colorado.

88.   Prisoners have the right to be provided medical care that is within the community standard of care.

89.   At all times material, CCS and CHC had a duty to enact policies and procedures to ensure prisoners access to timely medical treatment by a qualified medical provider, and to train and supervise its staff to implement and enforce those policies and procedures.

90.   In order to cut costs and make a profit, CCS and CHC routinely denied prisoners, including Plaintiff, access to timely medical treatment by a qualified medical provider by having nurses practice outside the scope of their licenses to diagnose and treat serious injuries including spinal injury, causing permanent injury.

91.   At all times material, CCS and CHC had a duty to hire an adequate number of medical providers including physicians pursuant to its independent legal duties and its contract with the state.

13

92. Due to the actions of the Defendants, the Plaintiff suffered pain and suffering, debilitating injuries and permanent disability.

**FIRST CLAIM FOR RELIEF**
**(Section 1983 Violations of Plaintiff's Civil Rights**
**Under the Eighth Amendment to the U.S. Constitution Cruel and Unusual**
**Punishment)**

93. The allegations and statements in Paragraphs 1 through 89 are incorporated herein by reference.

94. Defendants were deliberately indifferent to a serious risk of illness and injury, which constituted cruel and unusual punishment in violation of the Eighth Amendment, and which consisted, *inter alia,* of the following:

(a) Defendants, Matthew Kilough, Christina Sturgeon, CCS and CHC knew that Plaintiff had an injury while in Denver County jail and suffered from numbness and pain prior to entering both Jefferson County Correctional and Department of Corrections' custody because it was recorded in his medical records. Referral to a specialist is standard treatment for a patient suffering from pain and numbness after a fall due to the well-known, substantial risk of spinal injury and resulting paralysis. The risks of failing to properly treat an injury after a fall are well documented in medical literature, which was widely available over the internet, and part of any medical provider's education and training. Defendants were deliberately indifferent in denying Plaintiff appropriate treatment including practicing beyond their specializations and failing to provide access to appropriate medical testing and specialists.

14

(b) CCS and CHC were deliberately indifferent in ignoring a request for an appointment with a neurologist and schedule an MRI submitted by Plaintiff directly to their attention in which he complained of his numbness, pain and loss of sensation.

(c) CCS and CHC failed to properly provide access to timely medical treatment by qualified medical providers to Mr. Eastman and instead had nurses practice outside the scope of their licenses to diagnose and treat serious injuries including spinal injury, causing permanent injury.  This practice amounted to deliberate indifference to Mr. Eastman's medical needs and violated his constitutional rights.

(d) Nurse Practitioner Sturgeon was deliberately indifferent by practicing outside of her medical specialty.  Mr. Eastman had previously been seen by a neurologist who made recommendations.  NP Sturgeon ignored those recommendations and delayed referral to a doctor.  NP Sturgeon was aware of the severity of Mr. Eastman's condition upon her initial review and the delay demonstrated deliberate indifference to Mr. Eastman's medical condition. The Plaintiff does not deny that some treatment was provided.  However, it rose to the level of inadequacy that it demonstrated deliberate indifference. Pursuant to C.R.S. 12-38-101, nurse practitioners are limited in their scope of medical diagnosis and NP Sturgeon exceeded her medical authority. The delay in treatment resulted in substantial harm.

15

(e) PA-C Matthew Kilough was deliberately indifferent by practicing outside of his medical specialty. Mr. Eastman had previously been seen by a neurologist who made recommendations. PA Kilough ignored those recommendations and did not refer Mr. Eastman to a doctor. Mr. Kilough was aware of the severity of Mr. Eastman's condition upon his initial review and the delay demonstrated deliberate indifference to Mr. Eastman's medical condition. The Plaintiff does not deny that some treatment was provided. However, it rose to the level of inadequacy that it demonstrated deliberate indifference. Pursuant to Colorado Revised Statutes §12-36-106, physician's assistants are limited in their scope of medical diagnosis and Mr. Kilough exceeded his medical authority deliberately indifferent by failing to properly treat Mr. Eastman's medical conditions and testing related to his neck and back. Mr. Kilough failed to provide any treatment recommendation to Mr. Eastman despite diagnostic testing demonstrating the need for treatment.

95. As a direct result of each of these Defendants' deliberate indifference to a serious risk of paralysis, Plaintiff was seriously injured and damaged in the following particulars:

(a) Economic damages in past and future medical bills and future loss wages.

(b) Past and future non-economic damages consisting of physical and mental pain and suffering, anxiety, fear, stress, distress, humiliation and embarrassment.

(c) Physical impairment and disfigurement which is permanent.

16

(d) Loss of life enjoyment and impairment of quality of life, past and future.

(e) Future medical, rehabilitation and other health care expenses in an undetermined amount.

(f) Partial or complete loss of future earning capacity.

(g) Permanent injuries and disability.

96. The conduct of each of the Defendants in deliberately failing, with indifference, to provide Plaintiff with timely medical care and treatment from a qualified provider for his serious medical condition caused him to suffer intense pain and a worsening of his condition, as well as permanent physical injury, and severe emotional distress.

97. The conduct of each of the Defendants constitutes reckless or callous indifference to Plaintiff's health, safety and welfare entitling the Plaintiff to punitive or exemplary damages against each of the Defendants in their individual capacities under color of law.

### SECOND CLAIM FOR RELIEF

**(Conduct Which Was Willful or Wanton Under Colorado Law)**

98. The allegations and statements in Paragraphs 1 through 94 are incorporated herein by reference.

99. Defendants were willful or wanton in purposefully denying Plaintiff access to specialized care for his serious injury, which conduct they must have realized as dangerous, done heedlessly and recklessly without regard to the consequences, rights or safety of Plaintiff as described above.

17

100. The Defendants' actions caused damages to the Plaintiff as described above.

## THIRD CLAIM FOR RELIEF
### (Municipal Liability Against CCS and CHC)

101. All of the above allegations are incorporated herein by reference.

102. CCS and CHC had a policy or custom of routinely denying prisoners including Plaintiff access to medical treatment by a qualified medical provider, having nurses practice outside the scope of their licenses by diagnosing and ordering treatment for medical illness without physician oversight, and denying prisoners including Plaintiff needed pain medications, purposefully failing to adequately staff and/or train and supervise staff to provide prisoners including Plaintiff access to medical treatment, all of which was the moving force in causing or substantially contributing to Plaintiff's injuries and damages as described in paragraph above, *Supra*. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003).

103. The Defendants' actions caused damages to the Plaintiff as described above.

## FOURTH CLAIM FOR RELIEF
### (Negligence)

104. All of the above allegations are incorporated herein by reference.

105. Defendants, Maria Rostad, NP Sturgeon, David Smith, and Matthew Kilough each had a duty to provide medical care that is within the community standard of care.

106. Defendants each breached their duty to provide medical care and treatment as described above.

18

107.  As a direct result of each of the Defendants' negligence, Mr. Eastman was injured and damaged as described above.

**FIFTH CLAIM FOR RELIEF**
(Respondeat Superior)

108.  All of the above allegations are incorporated herein by reference.

109.  At all times material, each of the Matthew Killough, David Smyth, Christine Sturgeon and Maria Rostad were acting as an employee and/or agent of CCS or CHC, and was acting within the scope of his or her employment with CCS or CHC.

110.  By operation of law under the doctrine of *respondeat superior,* the negligence of each of these Defendants is imputed to Defendant CCS and CHC.

**SIXTH CLAIM FOR RELIEF**
(Civil Conspiracy)

111.  All of the above allegations are incorporated herein by reference.

112.  Each and every one of the Defendants agreed, by words or conduct, to have nurses practice outside the scope of their licenses, and in so doing, to deny prisoners including Plaintiff, access to timely medical treatment by a qualified medical provider, and to further deny prisoners including Plaintiff needed evaluations.

113.  The conduct described above in Complaint constitutes a civil conspiracy and the conduct of all persons who participated in the conspiracy is imputed one to the other, giving rise to joint liability.

**SIXTH CLAIM FOR RELIEF**
(Outrageous Conduct)

114. All of the above allegations are incorporated herein by reference.

115. Defendants each engaged in extreme and outrageous conduct as described above, recklessly and with the intent to cause Plaintiff severe emotional distress and the Defendants' conduct did cause him to suffer severe emotional distress.

116. The outrageous conduct of CCS's and CHC's agents and employees is imputed to CCS as a matter of law.

117. The outrageous conduct by the aforementioned Defendants constitutes willful and wanton conduct giving rise to punitive damages, and Plaintiff reserves the right to request punitive damages after sufficient discovery has been completed.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment be entered against Defendants and each of them in an amount sufficient to compensate Plaintiff for his injuries, damages, and losses, for attorney's fees and interest as provided by law, for punitive damages pursuant to Title 42 U.S.C. § 1983 and Title 42 U.S.C. § 1988, and for his costs, expert witness fees, and such further relief as the Court deems just and appropriate.

Dated this 2nd day of May, 2017.

Respectfully Submitted,

s/Natacha M. Gutierrez

_____
Natacha M. Gutierrez, Esq.
Colorado Bar #43240

20

Law Offices of Natacha M. Gutierrez, LLC
695 S. Colorado Blvd.., Suite 480
Denver, CO 80246
303-900-3281
Fax: 1-866-632-9151
natacha@nmgutierrezlaw.com
ATTORNEY FOR PLAINTIFF

Plaintiff's Address:

Michael Eastman
2301 Lawrence Street
Denver Colorado 80205

**PLAINTIFF DEMANDS TRIAL TO A JURY OF SIX PERSONS.**